# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

DAVID JASON TAYLOR,                          )
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )        Case No. 4:21-cv-00127-TWP-KMB
                                             )
PRACTITIONER ROY WASHINGTON,                 )
KELLEY JOHNSON Nurse: Medical Staff          )
Individual and Official Capacities,          )
NURSE COURTNEY NICHOLS,                      )
                                             )
                    Defendants.              )

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ON SANCTIONS

This matter is before the Court following a show cause hearing on sanctions held on August 21, 2023. On October 7, 2022, this Court granted in part a Motion for Preliminary Injunction filed by *pro se* Plaintiff David Jason Taylor ("Taylor") (Dkt. 61).  In February 2023, the Court ordered Nurse Practitioner Roy Washington ("NP Washington") to show cause why he should not be held in civil contempt or otherwise sanctioned for violating the Preliminary Injunction.  (Dkt. 101). The Court also ordered NP Washington and his attorney, Carol Dillon ("Attorney Dillon"), to show cause why they should not be sanctioned for filing a sworn declaration with false statements, then failing to correct it once the falsity of those statements surfaced.  *Id*. In this Order, the Court sets forth its findings of fact and conclusions of law following the August 21, 2023 hearing and assesses sanctions against NP Washington and Attorney Dillon.

## I.    FINDINGS OF FACT

1.     Taylor, a federal criminal defendant, filed this civil rights action while awaiting trial and detained in the Floyd County Jail ("the Jail"). (Dkt. 1.)

2.      The action surrounds claims that Taylor was deprived of necessary medical care while at the Jail.  This action is proceeding with Fourteenth Amendment medical care claims against Nurse Johnson, Nurse Nichols, and NP Roy Washington, (collectively "the Defendants") (Dkt. 63 at 8)[1]. On March 29, 2022 Attorney Carol Dillon and Christopher Farrington, with the law firm of Bleeke Dillon Crandall, P.C. appeared on behalf of the NP Washington. (Dkts. 21, 22). A final pretrial conference is scheduled for July 31, 2024, and jury trial on August 26, 2024.

A.      **Preliminary Injunction**

3.      In July 2022, Taylor moved for a Preliminary Injunction.  (Dkt. 42.)

4.      He sought immediate attention for several medical concerns, including elevated blood pressure, severe pains in his left side, and swelling in his left arm and leg, to the extent his hand turns purple.  *Id.* at 2.

5.      Taylor asked "to be seen by a doctor qualified to diagnose" his conditions and "a CT scan." *Id.*

6.      The Court prefaced its ruling on the request for injunctive relief with the following observation:

> Taylor's motion for preliminary injunction presents three challenges. First, Taylor seeks specialized treatment for several medical conditions—conditions that are not obviously connected to one another and might require referrals to multiple specialists. Second, the record is massive, including medical records spanning nearly 18 months. Third, Taylor's medical condition—and therefore any need for preliminary injunctive relief—is dynamic. His condition and treatment in 2021 might inform his need for urgent care in October 2022, but they are not dispositive, and his needs may change again before this matter concludes.

(Dkt. 61 at 4.)

7.  The Court found:

---

[1] Claims against Defendant Sheriff Frank Loop and Sergeant Kinderman were dismissed with prejudice pursuant to the parties stipulation following settlement. (Dkt. 129, Dkt. 146).

For a period of at least several months, Taylor had reported pain and numbness in his left arm and leg, and nurses have consistently observed that the arm and hand were swollen, purple, and, in at least one instance, warm to the touch. These symptoms would sound alarm bells in the mind of a lay person. Yet, it appears that neither NP Washington nor any physician has ever examined or investigated these symptoms in Taylor.

Taylor appears well positioned to demonstrate that the Defendants disregarded a medical condition that obviously required attention, or that their approach to his condition did not reflect an exercise of medical judgment, or that they persisted in a course of treatment (or non-treatment) that proved ineffective. *See Petties v. Carter*, 836 F.3d 722, 728–30 (7th Cir. 2016) (examples of deliberate indifference). Therefore, he necessarily has a substantial likelihood of demonstrating that the Defendants' approach to the swelling and redness in his left extremities was objectively unreasonable. Given that his symptoms suggest a need for urgent medical attention, he has also shown a risk of irreparable harm justifying a narrow preliminary injunction.

Dkt. 61 at 8-9.

8.     Taylor's broad motion for preliminary injunctive relief was granted in part, and he

was awarded a narrow Preliminary Injunction:

Taylor's Motion for Immediate (Preliminary) Injunctive Relief, Dkt. [42], is **GRANTED to the limited extent** that the Court **orders** Defendant Roy Washington to file **one** of the following by **no later than Friday, October 14, 2022**:

(a) a notice that NP Washington has examined Taylor with particular attention to the ongoing pain, numbness, swelling, and redness in his left arm and leg. This notice must state NP Washington's diagnosis and plan for treating the condition.

(b) a notice confirming that NP Washington has identified an appropriate physician to assess and treat the ongoing pain, numbness, swelling, and redness in Taylor's left arm and leg; that an appointment has been scheduled; and that he will implement any recommendations from that physician.

This Preliminary Injunction extends no farther than necessary to correct the harm requiring preliminary injunctive relief—namely, that Taylor's swollen, discolored limbs require thoughtful attention from a medical professional. The injunction is also narrowly tailored in that it allows NP Washington to satisfy its requirements without referral to a specialist, and the burden of an additional appointment with a patient NP Washington sees regularly should be slight. *See* 18 U.S.C. § 3626(a)(2).

*Id.* at 10 (emphases in original).

9.    The examination required by the Preliminary Injunction was warranted as a matter of law *and* stood to benefit the Court and the parties in resolving this case by providing a complete, current assessment of the medical conditions underlying Taylor's claims.

**B.  N.P. Washington's Notice of Compliance**

10.    On October 13, 2022, Attorney Dillon and her associate, Christopher Farrington, filed a Notice of Compliance with Preliminary Injunction Order stating that NP Washington examined Taylor as required on October 10, 2022.  (Dkt. 67.)

11.    Their notice stated:

> As to the lower extremities, NP Washington examined both Taylor's left and right legs. *Ex. A; Ex. B, ¶ 4.* Taylor had no edema or swelling in his legs. *Id.* Taylor's skin on his legs was pink and warm. *Id.* There was no color difference between the right and left legs. *Id.* NP Washington observed Taylor walk into the medical unit and sit on the exam table without any assistance. *Id.* NP Washington observed that Taylor's gait was steady with no limping or guarding. *Id.* This revealed to NP Washington that Taylor was not in any significant pain in his lower extremities which might impact his daily life. *Id.*

(Dkt. 67 at ¶ 4.)

12.    Counsel attached notes from NP Washington's examination, which included:

> Lower extremity- no edema noted, skin pink and warm, no color difference noted between the right and left extremity; he walked to medical and sat on the exam table without assistance; his gait is steady with no limping or guarding.
>
> …
>
> No swelling of the upper extremities and lower extremities noted upon examination[.]
>
> There is no discoloration on exam of the upper and lower extremities upon examination[.]

(Dkt. 67-1.)

13.     Counsel also attached an affidavit from NP Washington, sworn under penalty of perjury, (Dkt. 67-2), which stated:

> As to Taylor's lower extremities, I examined both Taylor's left and right legs. I observed no edema or swelling in Taylor's legs. Taylor's skin on his legs was pink and warm. I observed no color difference between the right and left legs. I observed Taylor walk into the medical unit and sit on the exam table without any assistance. I observed that Taylor's gait was steady with no limping or guarding. This revealed to me that Taylor was not in any significant pain in his lower extremities which might impact his daily life.
>
> ….
>
> …Because of the absence of complaints of pain and numbness, and the absence of any observable swelling or discoloration, I cannot make a determination of the cause of Taylor's previous complaints or develop a treatment plan for non-existent symptoms.

*Id.* at ¶¶ 4, 6.

**C.     Taylor's Responses to the Notice of Compliance**

14.     On October 17, 2022, Taylor filed a notice alleging that NP Washington did not examine his legs as directed in the Preliminary Injunction.  (Dkt. 69.)

15.     Taylor had not yet received NP Washington's Notice of Compliance.  (Dkt. 69-1 (envelope postmarked Oct. 12, 2022).)

16.     On October 20, 2022, Taylor filed a request for Jail security video of the examination.  (Dkt. 72.) The Court responded that he should serve a request for this evidence on the appropriate party pursuant to Fed. R. Civ. P. 34(a) (Dkt. 75).

17.     On October 21, 2022, Taylor responded to the Notice of Compliance, reiterating his allegation that NP Washington never examined his legs as directed in the Preliminary Injunction.  (Dkt. 74.)

18.     Although Taylor's submissions did not require responses, Attorney Dillon and Attorney Farrington responded on NP Washington's behalf on October 27, 2022, characterizing

Taylor's submissions as reflecting "disagreement" with the treatment he received at the Jail. (Dkt. 76 at ¶¶ 6-7.)  They also asked the Court to accept NP Washington's sworn submissions as truthful and discount Taylor's assertions because they were not sworn under penalty of perjury.[2]

19.    On November 28, 2022, Taylor moved the Court to order NP Washington to comply with the Preliminary Injunction by referring him to a different doctor.  (Dkt. 84.)

20.    Taylor stated in his motion that Jail staff verified that the examination was recorded by the Jail's security cameras and that the video had been preserved.  *Id.* at ¶ 8.

21.    Attorney Dillon responded on NP Washington's behalf on December 12, 2022. (Dkt. 88.)  Once again, counsel asserted that NP Washington "complied with all Court Orders regarding Plaintiff's medical care."  *Id.* at ¶ 5.

22.    Attorney Dillon also characterized Taylor's submissions as expressions of "dissatisfaction with the medical treatment he has received and continues to receive" and "not a sufficient basis for the Court to question the adequacy of the medical care he is receiving."  *Id.* at ¶¶ 2, 3.

23.    Attorney Dillon did not address Taylor's representation that a video recording of the examination was preserved and would show that NP Washington did not complete the examination ordered by the Court or described in his treatment notes or affidavit.  *See* Dkt. 88.

---

[1]Dkt. 76 at ¶ 8 ("To the extent Mr. Taylor is attempting to create a factual dispute as to Roy Washington's examination and/or the accuracy of Roy Washington's Third Affidavit, Mr. Taylor's responses and the statements therein create no such material factual dispute. Most importantly, neither Mr. Taylor's nor any of the other alleged inmates' statements were made under oath or under the penalties of perjury, and as such they are not admissible evidence for this Court's consideration."), ¶ 10 ("As to Mr. Taylor's complaints of discrepancies between the examination as he perceived it and Roy Washington's Affidavit, again none of Mr. Taylor's statements or arguments to the Court are evidence."), ¶ 11 ("As noted above, Mr. Taylor's unsworn allegations cannot be considered as evidence.").

24.     Taylor replied on December 22, 2022, (Dkt. 90) and submitted the video recording referenced in his motion, stating "Medical footage of David Taylor with doctor on 10-10-2022" (Dkt. 91).  The court docket reflects receipt of 1 DVD.

**D.     The Video**

25.     The four minute, seventeen second recording has no audio. The video shows:

    (a)     Taylor, enters an examination room, sits down, undergoes a brief medical examination, and exits the room[3].

    (b)     During the first two minutes, a female medical professional takes Taylor's blood pressure, pulse, and temperature. During this time, NP Washington sits at a desk a few feet away from the examination table.

    (c)     As NP Washington stands up, Taylor opens the top of his prison jumpsuit and removes his shirt. The pant legs of Taylor's jumpsuit remain closed to the waist and at no time is the pant leg lifted.

    (d)     For the next 90 seconds, NP Washington holds a stethoscope to Taylor's back, chest, abdomen, and neck as Taylor breathes.

    (e)     NP Washington squeezes the fingertips on each of Taylor's hands.

    (f)     Taylor puts on his shirt, closes his jumpsuit, stands up, and walks out of the room.

**E.     The Show Cause Order**

26.     Although the video was docketed on December 22, 2022, Attorney Dillon did not respond to Taylor's submission of the video until the Court ordered her to do so on February 2, 2023.  (Dkt. 101 at 6)[4].

---

[3] Defendants do not dispute that Mr. Taylor is the patient in the video, nor do they dispute that NP Washington is the examiner.

[4] Specifically, on February 2, 2023, the Court ordered NP Washington and Attorney Dillon to show cause why they should not be held in contempt or otherwise sanctioned for violating the Preliminary Injunction. (Dkt. 101 at 6).

27.     Although the video showed that NP Washington did not provide the examination the Court ordered, the Court could not order him to comply with the Preliminary Injunction by redoing the examination or referring Taylor to a different doctor because by this time, Taylor had been transferred to a different facility. *See* Dkt. 101 at 5.

28.     The Court also ordered NP Washington and his counsel to show cause why they should not be sanctioned for knowingly presenting false statements, and failing to correct them, in their filings in response to the Preliminary Injunction and Taylor's motion to compel. *Id.*

## F.   Motions to Withdraw Filings

29.     On February 3, 2023, Attorney Dillon moved to withdraw the documents filed on NP Washington's behalf in response to the Preliminary Injunction and Taylor's notice alleging non-compliance. ( Dkt. 104.)   Four days later, she supplemented the motion and asked to withdraw the response to Mr. Washington's motion to compel.  (Dkt. 105.)

30.     The motion to withdraw stated:

It has since come to the attention of Defendants' Counsel that the information provided in Document Nos. 67, 67-1, 67-2, and 76 is not accurate and should not have been filed with the Court.

In compliance with the Rules of Professional Conduct, Defendants' counsel hereby notifies the Court that these documents should never have been filed, they contain false information, and should be removed from the Court's docket.

(Dkt. 104 at ¶¶ 3-4.)

31.     Magistrate Judge Barr denied the motions to withdraw, finding that the documents in question "are part of the record and must remain on the docket so the Court can resolve the matter of sanctions. Withdrawing the documents at this point in the proceedings will have no effect." (Dkt. 108.)

**G.** **Response to Show Cause Order: NP Washington's Affidavit**

32.    On February 15, 2023 NP Washington filed an affidavit in response to the Court's show cause order.  (Dkt. 109-2.)

33.    NP Washington affirmed that Attorney Dillon informed him of the Preliminary Injunction, but he did not remember by the time of the examination that he was examining Taylor in response to the Preliminary Injunction.  *Id.* at ¶¶ 4, 9.

34.    NP Washington had never examined a patient in response to a court order.  *Id.* at ¶ 10.

35.    NP Washington asked Taylor, at the beginning of the examination, "What am I seeing you for?" *Id.* at ¶¶ 5, 6, and Taylor responded, "the same thing." *Id.* at ¶ 6.

36.    NP Washington asserts that he did not understand from Taylor's answer that he had any complaints or problems regarding his legs.  NP Washington observed Taylor walk into the examination room, and he did not observe any abnormalities or distress in Taylor's gait.  *Id.* at ¶¶ 5-6.

37.    NP Washington concedes that he did not examine Taylor's legs as directed by the Preliminary Injunction.  *Id.* at ¶ 9.

38.    After completing the examination and dismissing Taylor, NP Washington saw patients at seven more county jails.  *Id.* at ¶ 8.

39.    NP Washington did not write the treatment notes submitted with his Notice of Compliance until after he completed those examinations and approximately 14.5 hours after he examined Taylor.  *Id.* at ¶ 7.  It is not clear that NP Washington handwrote or dictated any notes at the time he examined Taylor or whether he reviewed those notes before writing the notes that he ultimately submitted to the Court.

40.     When NP Washington wrote his treatment notes, he remembered that his examination of Taylor was ordered by the Court and that he was directed to address specific complaints.  *Id.* at ¶ 10.  He did not remember what those directions were, and he did not review them before writing his notes.  *Id.*

41.     NP Washington contends that he did not remember when he wrote his treatment notes that he had not examined Taylor's legs.  *Id.* at ¶ 10.  Still, he wrote in his treatment notes that he examined Taylor's legs and that they were normal.  *Id.*

42.     NP Washington states that he did not intend "to mislead, lie, or deceive the Court or Taylor in any way." *Id.* at 11.

43.     NP Washington would have examined Taylor's legs if Taylor asked him to do so.  *Id.* at ¶ 18.  Yet he recognizes "that this does not excuse the fact that the Court instructed me to examine Taylor's legs, that I did not, and that my documentation of the October 10, 2022 exam indicates that I did."  *Id.*

44.     NP Washington believes that he had "done everything for [Taylor] that was required based on the standard of care in the community for a primary care provider."  *Id.* at ¶ 19.

**H.      Response to Show Cause Order: Attorney Dillon's Affidavit**

45.     Attorney Dillon also filed an affidavit in response to the show cause order. (Dkt. 109-1.)

46.     The Jail's nursing staff sent NP Washington's treatment notes from the October 10, 2022 examination to Attorney Dillon on October 12, 2022.  *Id.* at ¶ 7.  Using those notes, her co-counsel, Attorney Farrington, drafted an affidavit, which NP Washington approved after Attorney Farrington discussed it with him and edited it, and the Notice of Compliance.  *Id.* at ¶¶

7, 9.  Attorney Farrington later moved on to a different law firm and had no knowledge that NP Washington's account of the October 10, 2022 examination was untruthful.  *Id.* at ¶ 7.

47.     When Taylor filed his first notice regarding the insufficiency of the examination, Attorney Dillon "did not question the accuracy of Roy Washington's Affidavit or charting because up to that time, Taylor had expressed dissatisfaction with a great deal of his medical care in the Floyd County Jail."  *Id.* at ¶ 10.  She also did not know at that point that the exam was video recorded.  *Id.*

48.     On November 28, 2022 Taylor filed his Motion to Compel compliance with the Preliminary Injunction, notifying the Court and the Defendants that the examination was recorded.  (Dkt. 84.)

49.     The following day, Attorney Dillon emailed counsel for the Floyd County Sheriff and asked whether video had been preserved as Taylor alleged. The Sheriff's counsel responded the same day that she had not yet discussed the matter with her clients but would send the video to Attorney Dillon if it was preserved.  (Dkt. 109-1 at ¶ 11.)

50.     Attorney Dillon responded to Taylor's Motion to Compel on December 12, 2022. (Dkt. 88.)

51.     Counsel for the Sheriff emailed Attorney Dillon on December 21, 2022 and confirmed that a video of the examination had been preserved.  (Dkt. 109-1 at ¶ 12.)  She said she would produce the video but did not do so immediately.  *Id.*

52.     On December 22, Taylor filed the video, along with his reply in support of the motion to compel. Dkts. 90, 91.

53.     On December 30, 2022, Attorney Dillon filed two motions to extend unrelated pretrial deadlines (Dkts. 93, 94), and on January 1, 2023 filed a reply in support of her request to extend the deadline for responding to Taylor's summary judgment motion. (Dkt. 98).

54.     Attorney Dillon emailed counsel for the Sheriff on January 4, 2023, and requested a copy of the video.  (Dkt. 109-1 at ¶ 12.)  She received a copy the next day.  *Id.* at ¶ 13.

55.     Attorney Dillon watched the video on January 5, 2023, and "recognized that some of the details in" NP Washington's treatment notes "may be questionable, particularly the notation about examining Taylor's legs." *Id.* at ¶ 14.  Noting that the video did not capture any audio and that she "did not know whether the video captured the entire examination," Attorney Dillon wanted to discuss the video in detail with NP Washington "before reaching any definitive conclusion." *Id.* at ¶ 14.

56.     Attorney Dillon took no further action until January 9, 2023, when she emailed a copy of the video to NP Washington.  *Id.* at ¶ 15.  She shared her concerns about the accuracy of NP Washington's treatment notes and instructed him to review the video. *Id.*

57.     NP Washington telephoned Attorney Dillon on January 11, 2023, and left a voicemail.  *Id.* at ¶ 16.  She did not return his call until after the Court issued its show cause order three weeks later.  *Id.*; Dkt. 109-2 at ¶ 16.

58.     During this time, Attorney Dillon "was spending the majority of [her] time preparing for a federal jury trial." Dkt. 109-1 at ¶ 16.

59.     Attorney Dillon filed a reply in support of her motion for time on January 18, 2023, a week after NP Washington telephoned her regarding the video.  (Dkt. 98.)

60.     The Court issued its show cause order on February 2, 2023.  (Dkt. 101.)  Attorney Dillon "immediately" telephoned NP Washington and drove to Lawrence County the next day to meet with him in person.  (Dkt. 109-1 at ¶ 17.)

61.     Attorney Dillon moved to withdraw the submissions containing false statements on February 3 and 7, 2023.  (Dkts. 104, 105.)

62.     Attorney Dillon asserts she "had no reason to question the accuracy or truthfulness" of NP Washington's submissions when they were filed.  (Dkt. 109-1 at ¶ 20.)

63.     Attorney Dillon did not doubt the truthfulness of NP Washington's submissions after Taylor filed his motion to compel "because it is not unusual for litigants to disagree about facts, and the inferences to be drawn from those facts, during the course of litigation."  *Id*.  She did, however, email counsel for the Sheriff to determine whether video was preserved as Taylor asserted.  *Id.* at ¶ 11.

64.     Attorney Dillon's "first opportunity to view the video" occurred on January 5, 2023, after counsel for the Sheriff provided it to her.  *Id.* at ¶ 21.  At this point, the video had been filed with the Court for roughly two weeks.  (Dkt. 91.)

65.     Had Attorney Dillon met with Mr. Washington more promptly, she would have taken the same course of action in response to learning that his submissions were untruthful.  (Dkt. 109-1 at ¶ 22.)  "In retrospect", she "would have preferred to have taken those steps before the Court's Show Cause Order was entered" but "it was only due to the press of other business that [she] did not do so."  *Id.*

66.     Attorney Dillon intends to ensure that filings regarding medical examinations at the Jail are truthful in the future by requesting video of any medical examinations as a standard practice.  *Id.* at ¶ 25.

I.     **Hearing**

67.     On March 3, 2023, the Court appointed recruited counsel to represent Taylor until final judgment is entered unless otherwise modified by written order. (Dkt. 116).

68.     On March 20, 2023 the Court appointed L. Katherine Boren and Joseph H. Langerak of Stoll Keenon Ogden PLLC to represent Taylor in this matter. (Dkt. 116). A hearing was held on the show cause order on August 21, 2023.  (Dkt. 155.) Taylor appeared with recruited counsel, Joseph Langerak[5].  NP Washington appeared with Attorney Dillon and her law partner, Richard Moore.

69.     Attorney Dillon and NP Washington were sworn and discussed their conduct and the efforts they will take to avoid similar problems in the future.

70.     Attorney Dillon argued that NP Washington's failure to complete the examination as directed by the Court arose from "an odd situation where he was asked to examine a patient by a court, and so it was driven by that versus driven by the patient's actual complaints."  (Dkt. 155 at 12:14-18.)  To ensure that he complies with court orders in the future, Attorney Dillon has advised NP Washington to make a special trip to complete court-ordered examinations (rather than integrating them into his ordinary schedule) and "do his charting contemporaneously or right after the exam."  *Id.* at 13:4-12.

71.     Attorney Dillon explained that she sought to obtain security video from the Jail, even after it was filed on the docket, to ensure that it captured the correct appointment in its entirety.  *Id.* at 15:20-16:5. She did not explain why she thought the video Taylor filed on the docket would differ from the video produced by the Jail in any of those respects.  She also did not indicate that she watched the version filed on the docket or tried to do so.

---

[5] Recruited Counsel Langerak representation was withdrawn on February 29, 2024, but counsel will remain on the distribution list concerning this order only. (*See* Dkts. 157, 158).

72.     Attorney Dillon had "no excuse" for failing to discuss the video with NP Washington until after the Court issued its show cause order except that she was busy preparing for trial in another matter.  *Id.* at 16:6-11.

73.     NP Washington apologized for his error and stated that he intended to comply with the Preliminary Injunction and did not intend to lie to Taylor or the Court.  *Id.* at 18:22-19:2, 19:19-23.

74.     Attorney Dillon argued that, although NP Washington failed to complete the examination as directed, documented it inaccurately, and submitted that inaccurate documentation to the Court, Taylor "does have some responsibility" for failing to ask NP Washington to examine his legs during the examination.  *Id.*at 27:14–21.

75.     Attorney Dillon argued that Taylor did not experience any "serious health issues with his legs specifically" and that there is evidence he was "less than truthful about his subjective complaints."  *Id.* at 26:23–28:23.

76.     Attorney Dillon agreed that NP Washington should be sanctioned and suggested a fine between $500.00 and $1,500.00 and a continuing education course on ethics as appropriate sanctions.  (Dkt. 155 at 11:15).

## II.     <u>LEGAL STANDARDS</u>

NP Washington's violation of the Preliminary Injunction, his filing of false statements, and Attorney Dillon's failure to correct them implicate four sources of judicial sanctions:  the Court's inherent authority to punish civil contempt; its inherent authority to sanction misconduct; counsel's liability for excessive costs under 28 U.S.C. § 1927; and litigants' exposure to sanctions under Federal Rule of Civil Procedure 11(c).  The Court will discuss each source of authority.

A.    **Civil Contempt**

"It is firmly established that the power to punish for contempts is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (cleaned up).  For a party "to be held in civil contempt, he must have violated an order that sets forth in specific detail an unequivocal command from the court."  *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001).  The violation must have been "significant, meaning the alleged contemnor did not substantially comply with the order," and he must have "failed to make a reasonable and diligent effort to comply."  *U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).  "A district court ordinarily does not have to find that the violation was 'willful' to find a party in contempt, . . . and it may find a party in civil contempt if he has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989) (internal quotations omitted).  Evidence of contempt must be "clear and convincing."  *Hyatt*, 621 F.3d at 692.

A "court may impose sanctions for civil contempt in order to coerce compliance or to compensate the complainant for losses sustained as a result of the contumacious conduct." *South Suburban Housing Ctr. v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999).  A "district court has broad discretion to fashion such an award."  *Id.*  However, that discretion is limited in that the court "is obliged to use the least possible power adequate to the end proposed."  *Id.* (internal quotations omitted).

"Coercive sanctions induce a party's compliance with a court order in the future, while remedial sanctions compensate an injured party for an opponent's past non-compliance." *Bailey v. Roob*, 567 F.3d 930, 933 (7th Cir. 2009).  Because civil contempt sanctions must be coercive or compensatory rather than punitive, any fine "must of course be based upon evidence of

complainant's actual loss." *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947). "[C]ivil contempt is an improper method by which to punish perjurious or false testimony absent some element of obstruction of justice." *Jones v. Lincoln Elec.*, 188 F.3d 709, 738 (7th Cir. 1999).

**B.**   **Inherent Authority**

"A district court has inherent power to sanction a party who 'has willfully abused the judicial process or otherwise conducted litigation in bad faith.'" *Secrease v. W. & S. Life Ins.*, 800 F.3d 397, 401 (7th Cir. 2015); *see also S.E.C. v. First Choice Mgmt. Servs.*, *678* F.3d 538, 543 (7th Cir. 2012) ("Judges have inherent authority to impose sanctions for misconduct by litigants, their lawyers, witnesses, and others who participate in a lawsuit over which the judge is presiding.").

"In deciding what measure of sanctions to impose, the district court should consider the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Greviskes v. Universities Rsch. Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005) (cleaned up). "Sanctions, including dismissal, must be proportionate to the circumstances. . . . Considerations relevant to proportionality include the extent of the misconduct, the ineffectiveness of lesser sanctions, the harm from the misconduct, and the weakness of the case." *Donelson v. Hardy*, 931 F.3d 565, 569 (7th Cir. 2019) (internal citation omitted).

> [F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly.

*Secrease*, 800 F.3d at 402. "[C]ourts generally have an interest in both punishing a party's dishonesty and deterring others who might consider similar misconduct." *Secrease*, 800 F.3d at 402.

**C.    28 U.S.C. § 1927**

"Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "The purpose of § 1927 'is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs also bear them.'" *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005) (quoting *Kapco Mfg. v. C&O Enters.*, 886 F.2d 1485, 1491 (7th Cir. 1989)).

"A lawyer's subjective bad faith is a sufficient, but not necessary, condition for § 1927 sanctions; objective bad faith is enough." *Matter of Lisse*, 921 F.3d 629, 641 (7th Cir. 2019). "Attorneys demonstrate objective bad faith when they pursue 'a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound.'" *Id.* (quoting *Bell v. Vacuforce, LLC*, 908 F.3d 1075, 1082 (2018)). "The standard for objective bad faith does not require a finding of malice or ill will; reckless indifference to the law will qualify." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006).

When "an attorney's 'contumacious conduct threatens a court's ability to control its own proceedings,' the district court's inherent authority to impose sanctions is 'at its pinnacle.'" *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 958 (7th Cir. 2020) (quoting *Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018)).

### D.   **Federal Rule of Civil Procedure 11**

Rule 11(b) warns attorneys that, every time they file papers with the court, they make certain representations.  Relevant to this action, those representations include that their factual contentions have evidentiary support and that their denials are warranted by evidence or reasonably based on belief or lack of information.  Fed. R. Civ. P. 11(b)(3)-(4).  They also represent that they have undertaken "an inquiry reasonable under the circumstances" before filing to verify they can make these certifications in good faith.  *Id*.

"[T]he court may impose an appropriate sanction on any attorney, law firm, or party that violated" Rule 11(b) "or is responsible for the violation.  Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."  Fed. R. Civ. P. 11(c)(1).  "A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4).  "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  *Id*.  "The district court has wide latitude to determine what sanctions should be imposed for a Rule 11 violation, and may impose non-monetary sanctions when appropriate to deter repetition of the offending conduct."  *U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465, 471 (7th Cir. 2005).

"Rule 11 establishes an objective test, and as we have repeatedly observed, an 'empty head but a pure heart is no defense.'"  *U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465, 470 (7th Cir. 2005) (quoting *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1006 (7th Cir.1994)). Heavy caseloads do not excuse sanctionable conduct.  *Id*. ("Neither the firm's

caseload nor its practice of shuffling cases from one attorney to another within the firm excuses the type of negligent action that caused Sullivan–Moore to be evicted.").

### III.    CONCLUSIONS OF LAW: ROY WASHINGTON

NP Washington undisputedly violated the Preliminary Injunction.  He submitted evidence to his attorney that he knew was untrue and allowed it to be filed with the Court.  This conduct amounts to contempt, violates Rule 11(b), and warrants monetary and non-monetary sanctions under Rule 11 and the Court's inherent sanctioning authority.

### A.    Sanctionable Conduct

NP Washington failed to comply with the Preliminary Injunction. The Court unambiguously ordered him to file a notice that he "examined Taylor with particular attention to the ongoing pain, numbness, swelling, and redness in his left arm and leg" or that he referred Taylor for such an examination by another doctor.  Finding of Fact ("FF") 8.  The video Taylor filed on the docket showed definitively that NP Washington did not complete this examination, and NP Washington now admits that he did not.  (FF 25; FF 37.)

NP Washington did not "substantially comply" with the Court's order.  *Hyatt*, 621 F.3d at 692.  He was directed to assess symptoms including leg swelling and redness but never looked at Taylor's legs, and there is no contention that he asked Taylor about the symptoms set out in the Preliminary Injunction. This conduct warrants punishment as civil contempt.   "It is firmly established that the power to punish for contempts is inherent in all courts." *Chambers*, 501 U.S. at 44.  The Court's order was unequivocal and described with ample detail the symptoms NP Washington was to assess.  *Dowell*, 257 F.3d at 699.

The Court accepts as credible NP Washington's testimony that he "forgot" during the examination that it was occasioned by the Court's order.  (FF 33.)  This testimony does not,

however, excuse his failure to complete the examination as directed.  NP Washington attests that he remembered when he completed his treatment notes that he examined Taylor pursuant to the Preliminary Injunction and that he was directed to address certain symptoms, but he did not remember what they were.  (FF 40.)  If NP Washington had "been reasonably diligent and energetic in attempting to accomplish what was ordered," *Stotler & Co.*, 870 F.2d at 1163, he would have revisited the Preliminary Injunction, recognized that he did not complete the examination directed by the Court, and completed a supplemental examination as ordered.

The Court assigns no meaningful weight to NP Washington's explanation that he would have examined Taylor's legs had Taylor asked him to do so.  (FF 43.)  This assertion is undermined by the fact that the Court issued a Preliminary Injunction directing NP Washington to examine Taylor's legs because his previous requests for such an examination were allegedly rejected.  (FF 7.)  Perhaps Taylor could have been more collaborative during the examination, but NP Washington did not submit documents to the Court stating that he tried to complete the entire examination as directed but was prevented from doing so by an uncooperative patient.  And, as the Court noted in issuing the Preliminary Injunction, its purpose was both to ensure that Taylor's serious medical needs were being met *and* to create a then-current record of Taylor's medical condition.  (FF 6–8.)  Regardless of Taylor's level of collaboration, NP Washington performed his examination without any regard for the Preliminary Injunction or its objectives.

NP Washington also committed sanctionable conduct when he falsely documented in his treatment notes that he examined aspects of Taylor's legs that he did not, submitted them to his attorney, swore in an affidavit that he completed the examination that the Court directed, and permitted his attorney to file it.  This misconduct was willful.  *Secrease*, 800 F.3d at 397.  NP Washington acknowledges that, when he wrote his treatment notes, he did not document an

examination that he performed, or even an examination that he believed he performed.   He remembered generally that the examination "was entirely normal," so he "charted what would be a normal lower extremity exam."  (Dkt. 109-2 at ¶ 10.)  NP Washington knew he was not writing down what he did, what he saw, or what he touched.   He was carelessly and retroactively constructing notes consistent with an examination he generally remembered as normal—without any regard for whether it was an examination he completed.

Even if credible, NP Washington's testimony that he intended to comply with the Court's order and did not intend to lie to the Court or to Taylor holds no significance.  (FF 42; FF 72.) NP Washington may not have intended to defy the Court's order when he examined Taylor and ignored his legs.  When he completed his treatment notes, however, NP Washington knew the examination was occasioned by a Court order with specific requirements, and he never considered  whether he satisfied those requirements.  (FF 40.)  When his attorney gave him an affidavit swearing that he complied with the requirements of the Court's order, NP Washington signed it and allowed it to be filed without regard for whether he actually did.  NP Washington may not have intended to lie, but he also knew he was submitting documents that were not true— thus he knowingly lied.

## B.    Sanctions

Given the above Findings of Fact and Conclusions of Law, three sanctions are appropriate with respect to NP Washington.

### 1.  Fine

First, NP Washington will pay a fine of Two Thousand Dollars ($2,000.00) to Taylor. Assessment of this fine, under the Court's inherent authority to sanction willful abuse of the judicial process, is appropriate because neither coercive nor compensatory contempt sanctions

are available here.  The Court perceives that Taylor has endured some amount of stress and completed no small amount of legal work because of NP Washington's misconduct.  NP Washington cannot right the wrong by now completing the examination he was supposed to complete a year ago.  Importantly, "falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system" and "imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Secrease*, 800 F.3d at 402.  NP Taylor's misconduct surfaced only because Taylor managed, against all odds, to obtain and file video evidence documenting it.  It is unknown if similarly untruthful medical records and affidavits have been filed by NP Washington in cases where *pro se* prisoner litigants are simply unable to prove that they are false.  This Court has "an interest in both punishing a party's dishonesty and deterring others who might consider similar misconduct." *Secrease*, 800 F.3d at 402.  The Court finds that a $2,000.00 fine will amount to a substantial punishment for NP Washington and will deter other jail and prison medical providers or correctional officers tempted to defy court orders or file false statements.

### 2.  <u>Default</u>

Second, the Court will enter default against NP Washington on the question of liability. "A litigant's misconduct can justify default judgment, and perjury is among the worst kinds of misconduct." *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014) (internal citation omitted).  "In the federal criminal context, perjury is defined as 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'"  *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008).  NP Washington may not have acted maliciously when he submitted untruthful medical records and testimony, but his medical record and testimony was not untruthful due to confusion, mistake, or

faulty memory.  NP Washington constructed his treatment notes hours after his examination, based on what he thought a normal examination would show.  As noted earlier, he knew he was not documenting what he did, what he saw, or what he touched, but rather what a normal examination would reveal.  Nevertheless, he submitted his treatment notes and his affidavit as evidence of what he did, what he saw, and what he touched, knowing those statements were untrue.

While "perjury is a serious offense, one can imagine cases in which a sanction of dismissal would be excessive."  *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003).  This is not one of those cases.  There is no indication that Taylor "perjured himself as well."  *Id.*  NP Washington's false statements were not "clumsily committed and quickly discovered."  He knew the Court directed him to complete a specific examination but never bothered to confirm whether he complied with the Court's directions.  He knew when he prepared his treatment notes that he was not documenting *his* examination of Taylor, but rather "what would be a normal lower extremity exam."  (Dkt. 109-2 at ¶ 10.)  The perjury was discovered only after Taylor made *five* filings with the Court, including a security video he obtained on his own while incarcerated.  (*See* FF 14–24.)

The Court has considered lesser sanctions and determined that they would not be proportionate to NP Washington's misconduct or effective in repairing it.  Attorney Dillon recommended that NP Washington be sanctioned with a continuing education requirement, but such a sanction miscasts his misconduct.  Whether NP Washington is aware of best practices with respect to medical charting is irrelevant to the errors he committed here.  NP Washington knew when he wrote his treatment notes that he was supposed to examine certain things to comply with the Court's order, he did not remember what they were, and yet he chose to submit

documents to the Court attesting that he complied with the order.  Likewise, NP Washington knew when he wrote his treatment notes, and then when he signed his affidavit, that he was not documenting the examination he performed on Taylor, but rather what a "normal" examination would show.  Even if NP Washington innocently forgot at the start that he was examining Taylor pursuant to the Preliminary Injunction, he could have corrected his error by checking the requirements and recognizing that he could not honestly attest that he remembered completing the examination that was required.  Thereafter, he could have performed another examination and examined Taylor's legs as ordered by the Court.  NP Washington must commit himself to writing down and submitting to courts only evidence of things he did, not evidence of things he *usually* did.  Continuing medical education is not necessary to embrace this basic obligation.

The Court also considered allowing NP Washington to proceed to trial but prohibiting him from offering any of his treatment notes as evidence.  The Court will still apply this sanction, as discussed further below, but it alone is not adequate to repair the damage caused by NP Washington's false statements.  NP Washington's testimony reflects that he does not always (or perhaps often) create treatment notes close to the time he sees his patients and that he creates them from his broad recollections of the encounter rather than actual observations.  Such notes are not trustworthy evidence of his patients' conditions or the treatment he has provided, as demonstrated by his submissions in this case.  Practically, it is difficult to imagine NP Washington offering admissible (much less accurate) evidence of Taylor's condition or his treatment of it *without* referring to his treatment notes.  NP Washington saw patients at eight county jails just on the day he examined Taylor.  Dkt. 109-2 at ¶ 8.  Given his volume of patients, the passage of time, and the inaccurate information he has already presented in this case, it is unrealistic to expect him to present accurate information about Taylor's condition and

treatment from memory.  By presenting false medical records to the Court, NP Washington contaminated a major source of evidence on a critical issue and undermined the reliability of any potential fact-finding process.

Finally, the Court has considered that it commonly dismisses lawsuits brought by pro se plaintiffs and even restricts their abilities to file new cases when they present false statements to the Court.  *See, e.g.*, *Martin v. Fowler*, 804 F. App'x 414 (7th Cir. 2020) (affirming dismissal with prejudice and filing restriction for pro se plaintiff who falsely reported litigation history on motion to appoint counsel).  Indeed, dismissal is standard when a prisoner fails to acknowledge previous dismissals in an application for leave to proceed *in forma pauperis*.  *Sloan v. Lesza*, 181 F.3d 857, 859 (7th Cir. 1999); *see also Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) ("Restricted filers must still alert the court to their three-strikes status or risk dismissal and termination of their suits 'not only for lack of payment but also as a sanction for misconduct.'") (quoting *Ammons v. Gerlinger*, 547 F.3d 724, 725 (7th Cir. 2008); citing *Sloan*, 181 F.3d at 859).  The Court's inherent authority to sanction willful abuses of the judicial process and its interest in curbing such abuses are "symmetrical" and apply equally "to default judgments against defendants as well as to dismissals against plaintiffs."  *Secrease*, 800 F.3d at 401.  If the Court is to exercise that authority equitably, then default is appropriate for a party who disobeys a preliminary injunction, knowingly presents false evidence, and compromises a jury's ability to consider any evidence or determine any facts concerning the claims against him.

### 3.  Evidentiary Restriction

Third, in the trial of this matter, no Defendant may introduce or otherwise rely on treatment notes or other medical records authored by NP Washington as evidence of Taylor's medical condition or of the medical care he received.  If Taylor or his counsel refer to such a

document, the Defendants may then utilize it. This sanction is warranted on a fundamental, practical level. NP Washington's misconduct and his testimony about the process by which he generates his treatment notes cast doubt upon the truthfulness of all his treatment notes.

This sanction is necessary, even in addition to default on the question of NP Washington's liability because both the medical and legal profession must be able to rely on the truthfulness of medical records. Unless this matter is resolved by settlement, a trial will be necessary to determine NP Washington's damages and his codefendants' liability. NP Washington's treatment notes are no more credible in that context than they are on the question of his liability. This sanction is likely to serve as a substantial deterrent. Medical records often are the only documentation beyond a plaintiff's testimony, offered years later, of prisoners' medical conditions and the treatment they receive. Removing such documents from the record turns a dispute over medical care into a swearing contest between the plaintiff and the medical professional. The Court perceives that this is a substantial punishment for NP Washington and that other prison medical professionals would rather keep and present accurate records than face litigation with no records at all.

## IV. CONCLUSIONS OF LAW: CAROL DILLON

Attorney Dillon also committed sanctionable conduct—not because she knowingly filed materials containing false statements, but because she failed to take the most basic steps to correct those filings when their falsity became apparent. Because Attorney Dillon's error was significant, and because it fits into a pattern of similar conduct by attorneys in her law firm, a substantial fine is warranted.

### A.     Sanctionable Conduct

Attorney Dillon's handling of NP Washington's false statements was unacceptable and warrants serious sanctions.  The Court begins, however, with a positive.

The Court agrees with and accepts Attorney Dillon's statement that she had no reason to doubt the truthfulness of NP Washington's treatment notes, or the affidavit testimony based on those notes, when he submitted them for filing.  (FF 62.)  The moral of this story is not that attorneys should painstakingly distrust every piece of testimony offered by their clients.  Just as the Court should be able to trust that a medical professional's treatment records and sworn statements are truthful, so should his attorney.  Fed. R. Civ. P. 11(b) requires that attorneys make a reasonable inquiry before signing and submitting papers to the Court.  The record indicates that Attorney Farrington drafted an affidavit based on NP Washington's treatment notes, discussed it with NP Washington, and in fact edited it before filing.  (FF 46.)  Attorney Farrington's inquiry before filing the medical records, affidavit, and notice of compliance was reasonable, and it was reasonable for Attorney Dillon to approve its filing.

Just as it is not necessary for an attorney to assume that her client is lying, however, it is not prudent or productive for an attorney to assume that an adverse party is lying.  Once Taylor alleged that NP Washington's examination was incomplete, Attorney Dillon's actions and statements reflect a false assumption of dishonesty.  As a result, she failed to engage with a critical aspect of this case and fully honor her duties of diligence and candor.

### 1.     Response to Taylor's Initial Filings

Attorney Dillon "did not question the accuracy of Roy Washington's Affidavit or charting" when Taylor first alleged that his exam was incomplete "because up to that time, Taylor had expressed dissatisfaction with a great deal of his medical care in the Floyd County

Jail." (FF 48.) Attorney Dillon articulated the same sentiment in her written response to Taylor's filings—a response that was not even required, as no motion was pending. *See* Dkt. 76. Attorney Dillon recast Taylor's allegations of non-compliance as disagreements over treatment and point fingers at him for failing to ask NP Washington to examine his legs, and to relitigate the seriousness of Taylor's medical conditions and the need for the examination to take place at all. She framed Taylor's filings as an expression of his *disagreement* with NP Washington and a *demand* to receive specific care.[6] But Taylor did not allege in his filings that NP Washington examined his legs and reached the wrong conclusion, or that he prescribed the less effective of two treatments. He alleged that NP Washington *did not* examine his legs at all, then documented otherwise in his filings.

Attorney Dillon was not expected to withdraw NP Washington's filings based solely on Taylor's response. However, that Attorney Dillon did not question NP Washington's filings at all—and apparently did not communicate with NP Washington—after Taylor responded is not reasonable. Without any investigation, Attorney Dillon instead chose to file written responses that inaccurately framed Taylor's allegations as mere expressions of disagreement and dissatisfaction with his medical care and repeatedly urged the Court to discount Taylor's assertions because they were not sworn under penalty of perjury. (FF 18, FF 22.)

---

[6] *Id.* at ¶ 6 ("Mr. Taylor *disagrees* with the medical care he has received from Defendants throughout the entire time he has been incarcerated at the Floyd County Jail . . .. Mr. Taylor *disagrees* that Roy Washington's examination on October 10, 2022 was sufficient to satisfy this Court's Order on Plaintiff's Motion for Preliminary Injunction, and he believes only a second opinion from another doctor will suffice."), ¶ 7 ("While Mr. Taylor *disagrees* with the medical care Roy Washington has provided throughout this incarceration, and specifically the examination in response to this Court's Order which occurred on October 10, 2022, Mr. Taylor is not entitled to *demand* specific medical care he believes he is entitled to.") (all emphases added).

2.      **Response to Motion to Compel**

Taylor's initial filings in response to the incomplete medical examination may have left some gray area as to an appropriate response.  But his later filings—beginning with his Motion to Compel and culminating with his filing of the security video—demanded specific and prompt responses from Attorney Dillon.  Unfortunately, she did not respond appropriately or promptly.

Taylor filed his Motion to Compel, stating he had confirmed that video of the examination was preserved, on November 28, 2022.  (FF 19–20.)  To her credit, Attorney Dillon contacted counsel for the Sheriff the following day to confirm whether video was preserved and requested a copy.  (FF 49.)

Attorney Dillon did not follow up with counsel for the Sheriff.  She did not move for additional time to respond to the Motion to Compel, noting she promptly requested the video and wished to respond after having an opportunity to review it.  Instead, Attorney Dillon filed a terse response to the Motion to Compel on December 12, 2022.  (Dkt. 87.)  In barely one page, Attorney Dillon again dismissed Taylor's filings as indicating mere "dissatisfaction" over his medical care, *id.* at ¶ 2, and asserting that Taylor "has not presented anything to the Court that shows he is in immediate danger such that he will be harmed if the Court does not intercede." *Id.* at ¶ 4.   The latter suggestion, of course, disregards the fact that the Court *ordered* NP Washington to examine Taylor through a Preliminary Injunction, which inherently requires a finding of a risk of irreparable harm and in which the Court found "a need for urgent medical attention."  (FF 7.)

Attorney Dillon's clearest failings came after Taylor filed the video and his reply in support of the Motion to Compel on December 22, 2022.  (FF 52.)  Attorney Dillon did not seek leave to file a surreply given the newly submitted evidence, and she did not seek more time to

review that evidence. In fact, she filed no response to the video substantiating Taylor's allegations until six weeks later, after the Court ordered her to do so.

The Court is not persuaded by Attorney Dillon's explanation that her "first opportunity to view the video" came on January 5, 2023, after counsel for the Sheriff finally provided it to her. (FF 64.)   This justification understates Attorney Dillon's control over and responsibility concerning this case.   Taylor — an inmate proceeding without counsel — verified that video existed by November 28, 2022.  He managed to obtain the video from the Jail staff — for use in a lawsuit against Jail staff — and file it *on the docket* by December 22, 2022.  Even considering the winter holidays, it should not have taken Attorney Dillon two additional weeks to view the four minute seventeen second video.

To the extent Attorney Dillon contends she could not view the video sooner because counsel for the Sheriff did not share it earlier, the Court is not persuaded.  Attorney Dillon does not indicate that she tried to follow up with the Sheriff's counsel between the filing of the video on December 22, 2022 and January 4, 2023.   If the Sheriff's counsel was not responsive, Attorney Dillon could have obtained the video from the Court beginning December 22, 2022. January 4, 2023 was not Attorney Dillon's first opportunity to view the video; it was her first opportunity to watch the video as provided by her preferred means.

To the extent Attorney Dillon asserts she needed to obtain the video from the Sheriff before viewing it to verify its completeness and authenticity, (FF 70), the Court is similarly unpersuaded. Attorney Dillon has not explained why she suspected the Jail staff might have provided a different video to Taylor than to the Sheriff's counsel.  She has not explained how Taylor, who has been incarcerated for the entirety of this litigation, might have edited, or altered the video provided by the Jail staff.  Regardless, she could not have reached either conclusion

without viewing the video Taylor submitted and comparing it to video obtained through her preferred channel. She has not explained why it would have been unreasonable for her to begin by watching the available version of the video, then seek to confirm its authenticity and completeness, rather than wait indefinitely to respond to the serious accusations against her client. Her failure to address these issues, coupled with her dismissiveness toward Taylor's allegations in her earlier filings, suggest that she did not act more quickly to watch the video because she did not take seriously Taylor's allegations or the implications of NP Washington's dishonesty and non-compliance with the Preliminary Injunction.

Attorney Dillon has rightly acknowledged that her delay in discussing the video with NP Washington and correcting his untruthful filings was inexcusable. That said, the Court assigns no weight to Attorney Dillon's explanation that other pressing business prevented her from responding more promptly for four reasons.

First, Attorney Dillon's explanation is inconsistent with her other actions in this case. Attorney Dillon found time to file standard motions to extend unrelated deadlines and a reply in support of one of those motions after Taylor filed the video. (FF 26.) She managed to devote at least some time and attention to this case—just not to the matter of NP Washington's false medical records and affidavit.

Second, all litigators are busy. Practicing law requires lawyers to constantly prioritize and reprioritize the countless entries on their to-do lists. The Court can imagine few responsibilities more serious than reviewing a video alleged to demonstrate that a client presented false evidence to the Court and then acting promptly to correct the false submissions. Attorney Dillon's explanation that she was busy preparing for a trial in another matter—

apparently for two weeks after the video was docketed, and then for another three weeks after she watched it—says more about her priorities than her workload.

Third, Attorney Dillon is not a solo practitioner.  She is a named partner of a firm employing three other shareholders, three other attorneys, and two staff members.[7]  If Attorney Dillon was overwhelmed with other responsibilities, she has not explained why she could not enlist another member of her team to obtain the video or meet with NP Washington more promptly. Again, the Court finds this failure to delegate indicative of mis-prioritization rather than a heavy workload.

Finally, it is impossible to view Attorney Dillon's assertion that she was too busy to view the video, meet promptly with NP Washington, or correct his false submissions in isolation from her remarks before and after the video came to light.  Attorney Dillon initially insisted that Taylor merely "disagreed" with NP Washington's treatment plan.  She continues to maintain that Taylor bears responsibility for the incomplete examination because he did not ask NP Washington to examine his legs, and she argues that Taylor did not have a serious health condition that needed to be addressed.  (FF 73, 74.)  To whatever degree these assertions are supported by facts, they are irrelevant.  The Court ordered NP Washington to conduct a medical examination because the record presented to the Court with the Motion for Preliminary Injunction revealed that Taylor had a potentially serious health condition that received no attention *and* because all the parties and the Court would benefit from up-to-date documentation of Taylor's condition.  NP Washington violated the Court's order and then failed to truthfully report his actions and findings.  Attorney Dillon failed to promptly respond to Taylor's allegations of NP Washington's misconduct and his definitive evidence of that misconduct, *i.e.*,

---

[7] https://www.bleekedilloncrandall.com/our-team/ (last visited April 11, 2024).

the video. By continuing to point fingers at Taylor, she dilutes any possible inference that she tried in good faith to correct the record.  Attorney Dillon maintained this posture even through the sanctions hearing, where her final remarks doubted the seriousness of Taylor's medical conditions and the need for the examination to take place at all. Her posture misses the point and raises concerns that Attorney Dillon is guided more by distrust of an antipathy toward her adverse party than by her duties to the court and fellow litigants.

Whereas Rule 11 holds litigants accountable for filing false or unsupported statements, Indiana Rule of Professional Conduct 3.3(a) holds that a lawyer must not knowingly "fail to correct a false statement of material fact or law previously made to the tribunal. "  Ind. R. Prof'l Conduct 3.3(a)(1).  If it comes to light that evidence a lawyer previously presented in good faith is in fact false, the lawyer "shall take reasonable remedial measures."  Ind. R. Prof'l Conduct 3.3(a)(3).  Local Rule 83-5(e) provides that "The Indiana Rules of Professional Conduct and the Seventh Circuit Standards of Professional Conduct . . . govern the conduct of those practicing in the court."

At minimum, Attorney Dillon's failure to view the video after it was filed, to meet with NP Washington after she viewed it, and then to take any remedial measure, to correct his statements or her filings affirming their reliability, before being ordered to do so by the Court was unreasonable for the reasons set forth above.  In failing to take reasonable steps to remedy her client's submission of evidence she knew was false, Attorney Dillon has willfully abused the judicial process, and she is subject to sanctions under the Court's inherent authority to sanction abuses and misconduct.  *Secrease*, 800 F.3d at 401.  The docket also reflects that Attorney Dillon's failure to take prompt corrective action has unreasonably and vexatiously multiplied these proceedings, subjecting her to costs, expenses, and fees under § 1927.

34

B.    <u>**Sanctions**</u>

Given the above Findings of Fact and Conclusions of Law, three sanctions are appropriate with respect to Attorney Dillon.

First, Attorney Dillon and her law firm are **ordered** to pay recruited counsel all "costs, expenses, and attorneys' fees reasonably incurred" in preparing for and attending the sanctions hearing on August 21, 2023.  These sanctions are appropriate under § 1927.  The parties and the Court would have spent far fewer hours litigating the question of sanctions had Attorney Dillon viewed the video promptly after it was filed, met promptly with NP Washington after watching it, and corrected his errors on her own.  A "reasonably careful attorney" would not have allowed such alarming allegations—and then such alarming evidence—to remain unaddressed for so long.  *Lisse*, 921 F.3d at 641.  Attorney Dillon's willful disregard of the issue created unnecessary costs, and it is appropriate that she and her firm bear them. *Riddle & Assocs.*, 414 F.3d at 835.

Second, Attorney Dillon is **ordered** to submit a copy of this Order to the General Counsels of all state bars where she is admitted to practice, or to the appropriate entity with jurisdiction over attorney discipline, within **seven (7) days** from the date of this Order.  Attorney Dillon **must** simultaneously file a report with this Court confirming she has done so, with copies of her submittals to the appropriate authorities attached.

Third, Attorney Dillon and her law firm are **ordered** to pay a fine of Twenty Thousand Dollars ($20,000.00) to Taylor. The Court assesses this fine under its inherent authority to sanction misconduct by attorneys.

A fine is warranted because Attorney Dillon has shown disregard for the veracity of her and her client's submissions to the Court and because she had multiple opportunities to correct

them but chose the opposite path each time.  *See First Choice Mgmt. Servs.*, 678 F.3d at 543

("Judges have inherent authority to impose sanctions for misconduct by litigants, their lawyers,

witnesses, and others who participate in a lawsuit over which the judge is presiding.").

Punishing the filing of false evidence and "deterring others who might consider similar

misconduct" are core concerns of the sanctioning authority, *Secrease*, 800 F.3d at 402, and the

Court has a strong interest in deterring other attorneys from taking the approach Attorney Dillon

took here.

　　　The Court recognizes that the size of this fine is substantial.  Such a large fine is

nevertheless necessary if it is to function as any kind of meaningful deterrent. The Court reaches

this conclusion after determining that Attorney Dillon's misconduct was extensive, and lesser

sanctions have proven ineffective deterrents for Attorney Dillon and colleagues at her firm.  *See*

*Donelson*, 931 F.3d at 569.

　　　Unfortunately, this is not an isolated incident.  Five years ago, one of Attorney Dillon's

law partners and their firm were sanctioned in *Littler v. Martinez*, No. 2:16-cv-00472-JMS-DLP,

Dkt. 248 (Mar. 5, 2019).  Attorney Dillion was listed as one of the counsels in that case.

Sanctions were imposed after Attorney Dillon's partner failed to review video evidence, filed an

affidavit on behalf of a client shown to be false by that video evidence, then failed to correct the

client's false statements; and persisted with a summary judgment motion rendered meritless by

the video evidence[8].  A fine was not issued in *Littler*, instead, Attorney Dillon's partner was

ordered to pay opposing counsel's costs and fees, report the Court's order to relevant disciplinary

---

[8] The facts of *Littler* were different from the facts of this case, and the Court does not mean to suggest that
Attorney Dillon's failures here were the same as her partner's.  Rather, the Court cites *Littler* only to show
that its lessons have not stuck—and so the Court should not expect the lesser sanctions applied in *Littler*
to have any greater effect this time around.

bodies, and complete a continuing education requirement.  Judge Jane Magnus Stinson ordered all the firm's attorneys—including Attorney Dillon—to certify compliance with Rule 11 when filing summary judgment motions or responses. In *Littler*, Judge Magnus-Stinson emphasized this Court's non-negotiable expectation that attorneys approach *all* their cases with the utmost seriousness and *all* litigants with the utmost respect, regardless of their incarceration or representation.[9] Attorney Dillon's assumption that Taylor's accusations against NP Washington were untrue, and her failure to respond to them promptly or seriously—even when they were proven true by video—fall well short of that expectation.

More recently, Attorney Dillon was sanctioned by another judge in this court for conduct that "inexplicably delayed and derailed the discovery process, wasted everyone's time, and even ignored a Court order along the way." *See Smith v. Marion Cnty. Sheriff's Dep't*, No. 1:22-cv-01367-JRS-CSW, Dkt. 147, at *1 (S.D. Ind. Aug. 22, 2023).  Attorney Dillon allowed discovery requests to remain unfulfilled for over ten months, then represented in the days before a discovery conference that she would fill all requests by week's end.  After the Court canceled the conference, Attorney Dillon failed to meet her own deadline and later missed a court-imposed deadline.

---

[9] *See Littler*, Dkt. 248 at 4 ("[M]uch of this could have been avoided had Mr. Crandall not dismissed Mr. Littler as a nuisance litigant."), 6 ("In all of these cases, the Court cannot and will not treat filings and evidence submitted by *pro se* prisoners differently than that submitted by represented parties. Counsel litigating against pro se prisoners cannot either."), 26 ("Mr. Crandall attempted to downplay the importance of Nurse Hagemeier's false statement to his legal arguments."), 28 ("The fact that he downplayed his misconduct during the hearing by attempting to convince the Court that the false evidence he presented was not relevant to the legal question under review only raised doubts about whether he was as contrite as he otherwise appeared during the hearing."), 30–31 ("It is telling that Mr. Crandall's first instinct was not to either (1) ensure that he reasonably investigated the facts before presenting them to the Court or (2) ensure that he carefully read and considered Mr. Littler's response and evidence cited therein. Instead, his first instinct was to regret that he presented false evidence not because it was false, but because he later determined that he did not need it to prevail. This suggests that Mr. Crandall does not fully grasp the specific misconduct that most concerns the Court, and the Court cannot be assured that similar misconduct will not occur in future cases.").

Magistrate Judge Baker ordered Attorney Dillon to pay opposing counsel's costs and fees. While Judge Baker's order was issued after the conduct at issue here, more important to this matter is the following passage from Judge Baker's order:

> When questioned, Attorney Dillon made little effort to justify the failure. Rather, she admitted that she prioritized other cases over this one and could have been more assertive in seeking responses from her clients. This does not amount to a substantial justification for failing to comply with the Court's Order.

*Id.* at 6.  Taken together, an inference can be drawn that Attorney Dillon has developed a pattern of failing to manage her work in a manner that allows her to fulfill basic and critical obligations to the court and opposing litigants.[10]

Finally, in October 2023, an associate from Attorney Dillon's firm was ordered to show cause why he should not be sanctioned for quoting statements in a summary judgment brief that did not appear in the affidavit cited or any other materials in the record.  *Seabrooks v. Wexford of Indiana*, No. 2:22-cv-00228-JRS-MKK, Dkt. 62 (S.D. Ind. Oct. 4, 2023).   In that case, the attorney explained in response that he copied that statement from a different brief, believed it was "universally applicable," and failed to confirm whether it was also supported by the record in the case at bar.  *Id.* at Dkt. 65, ¶ 7. The order to show cause was ultimately discharged because defendants' exhaustion defense was withdrawn. *Id.* at Dkt. 74.

The Court takes no pleasure in issuing this order. The Court acknowledges that running a law practice is not simple and recognizes that Attorney Dillon and her colleagues cannot resolve the concerns expressed in this Order through simple fixes. However, because the misconduct at

---

[10] The Court can never know what circumstances may have contributed to a pattern of concerning behavior like the one discussed here. It is important for attorneys to know that resources are available to support attorneys struggling with challenging personal or professional circumstances. *See, e.g.*, Indiana Judges and Lawyers Assistance Program, https://www.in.gov/courts/jlaphelps/ (last visited April. 12, 2024).

issue here is not isolated and appears to be representative of a lack of diligence and attention to ethical obligations, and because lesser sanctions have not proven effective in the past, the Court has attempted to identify a sanction that will have a meaningful impact on Attorney Dillon as an individual and on her firm. A fine of $20,000.00 is such a sanction.

## V.   CONCLUSION

For the reasons explained above, NP Washington is **ORDERED** to pay a fine of Two Thousand Dollars ($2,000.00) to Taylor. The Court will, by separate entry, enter default against NP Washington on the question of liability. NP Washington's damages and claims against all other defendants will be resolved by settlement or trial. In the event of a trial, no Defendant may introduce or otherwise rely on treatment notes or other medical records authored by NP Washington as evidence of Taylor's medical condition or of the medical care he received. If Taylor or his counsel refer to such a document, the Defendants may then utilize it.

Attorney Dillon and her law firm are **ORDERED** to pay recruited counsel all "costs, expenses, and attorneys' fees reasonably incurred" in preparing for and attending the sanctions hearing on August 21, 2023.

Attorney Dillon is **ORDERED** to submit a copy of this Order to the General Counsels of all state bars where she is admitted to practice, or to the appropriate entity with jurisdiction over attorney discipline, within **seven (7) days** from the date of this Order. Attorney Dillon **must** simultaneously file a report with this Court confirming she has done so, with copies of her submittals to the appropriate authorities attached.

Attorney Dillon and her law firm are **ORDERED** to pay a fine of Twenty Thousand Dollars ($20,000.00) to Taylor. This fine is due within thirty (30) days of the date of this Order.

The parties are **directed** to meet with the Magistrate Judge to discuss whether this matter might conclude with settlement or proceed to trial as scheduled on August 26, 2024.

Finally, Taylor's Motion requesting Status of Case (Dkt. 159) is **GRANTED** in that this Order explains the status of this case.

**SO ORDERED.**

Date:  4/23/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

David Jason Taylor, #32436-509
United States Penitentiary Terre Haute
Inmate Mail Parcels
P.O. Box 33
Unit E2-110L
Terre Haute, IN 47868

Laura Katherine Boren (Recruited Counsel for Plaintiff)
STOLL KEENON OGDEN PLLC
katie.boren@skofirm.com

Joseph H. Langerak, IV
STOLL KEENON OGDEN PLLC
joe.langerak@skofirm.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

J. Richard Moore
BLEEKE DILLON CRANDALL, P.C.
richard@bleekedilloncrandall.com

Travis W. Montgomery
BLEEKE DILLON CRANDALL, P.C.
travis@bleekedilloncrandall.com